# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BARBARA GORDON,

     *Plaintiff,*

vs.                                                                    Case No. 11-2547

COMPRESULTS, LLC, and
JAMES B. WEIR,

     *Defendants.*

## MEMORANDUM AND ORDER

This matter involves Plaintiff Barbara Gordon's claims for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964[1] and the Kansas Act Against Discrimination ("KAAD").[2]  Before the Court are Defendant James B. Weir's Motion to Dismiss (Doc. 15) and the Motion for Summary Judgment (Doc. 33) jointly filed by Defendants James B. Weir ("Weir") and CompResults, LLC ("CompResults").  Also before the Court is Defendants' motion to strike Plaintiff's expert witness designation (Doc. 49).  For the reasons stated herein, the Court grants Weir's motion for dismissal and Defendants' motion to strike Plaintiff's expert designation.  Defendants' motion for summary judgment is granted in part and denied in part.

[1] 42 U.S.C. § 2000e, et. seq.

[2] K.S.A. § 44-1001, et. seq.

# I.      Factual and Procedural Background[3]

Plaintiff Barbara Gordon is a fifty-seven year old female who worked for Defendant CompResults from 1998 until her termination on August 14, 2009.  Defendant CompResults is a Missouri limited liability company in the business of providing case management for workers' compensation claims.  Defendant Weir is a male resident of Kansas who began working with CompResults in 1992 as a liaison for St. Luke's Shawnee Mission Health Systems ("St. Luke's").[4]  The parties' relationship began in 1998, when Weir hired Plaintiff to work for CompResults as a receptionist and administrative coordinator.  At that time, Plaintiff had not earned any degree above a high school diploma, and she lacked prior experience or training in the healthcare and insurance industries.  As Plaintiff became more familiar with the business, Weir gradually gave Plaintiff more administrative duties, including aspects of office management, payroll, healthcare and retirement benefits, and administration of accounts receivable and accounts payable.  Plaintiff eventually held the unofficial title of second in command behind Weir.

## A.  Growth and Changes Following Weir's Acquisition of CompResults

In August 2007, Weir purchased CompResults from St. Luke's and became its President and owner.  At that time, Plaintiff and Weir began to express differing visions for the company's management and future.  Plaintiff repeatedly voiced her preference that CompResults remain small, but Weir believed that the company's success required significant growth in its work force, including the addition of nurses, billing analysts, sales professionals, customer service representatives, and executive-level managers.  Plaintiff also preferred that CompResults retain a

---

[3] In accordance with the procedures for dismissal and summary judgment, the facts set forth herein are uncontroverted for the purposes of the present motions before the Court.  If controverted, the facts are related in the light most favorable to the Plaintiff, who opposes Defendants' dispositive motions.

[4] St. Luke's owned CompResults from 1998 until Weir purchased the company in August 2007.

casual and informal culture, while Weir believed that the company's success required a more professional business environment.  Weir was concerned that Plaintiff would oppose many of the changes he intended to make after acquiring CompResults, but he maintained Plaintiff's employment in hopes that she would adapt as the changes were implemented.

Business disagreements continued to develop between the parties as Weir began to hire additional employees.  Weir immediately engaged a third-party human resources organization, People Wise, to provide human resource functions through its president, Kevin Robinson ("Robinson").   In July 2008, Weir hired Mike McTeer ("McTeer") to serve as the Chief Operating Officer, and McTeer now serves as the company's Vice President of Business Development.  Because McTeer had earned a graduate degree in business and had significant experience in the healthcare and insurance industries, Weir wanted McTeer to have substantial involvement in the company's development and day-to-day operations.  Weir was concerned that Plaintiff would become resistant to a reduced role as McTeer and others assumed additional responsibility within company.

In December 2008, Weir and McTeer discussed hiring an additional executive-level employee to perform many of the financial-management functions for which Plaintiff was then responsible.  Weir ultimately decided that CompResults needed to add a new executive position titled "Vice President of Finance" to be filled by someone with a graduate degree in finance and significant practical experience.  Weir later directed McTeer to create a job description for the position, and McTeer reported that most of Plaintiff's responsibilities could be assumed by a Vice President of Finance.  Because the job description created for Plaintiff's position required general financial management of the company and called for college or graduate education, Weir questioned whether Plaintiff was qualified to perform the full scope of her obligations.  As

additional positions were created within the company, CompResults implemented organizational charts. Plaintiff was upset that she was not consulted to approve of the organizational chart, and she felt that her exclusion signaled that things were changing within CompResults.

Finally, many of Plaintiff's complaints concerned the hiring and conduct of CompResults employee, Julie Watkins ("Watkins").[5] Watkins began working with St. Luke's and CompResults in 2005, and she had nearly twenty years of experience as a nurse and executive manager in workers' compensation cases. In January 2009, Weir decided to hire Watkins as a consultant to manage the company's Case Management Division.[6] At this time, Weir was having an extramarital affair with Watkins. Weir was very satisfied with Watkins' management of the Case Management Division as she substantially increased the number of nurses working for CompResults. On several occasions, Plaintiff told Weir and other CompResults employees that she questioned Weir's judgment after he decided to hire Watkins. Plaintiff also felt that Watkins was taking too much power, and that Watkins' work began to overlap with Plaintiff's work.

**B. Weir's Concerns Regarding Plaintiff's Performance and Compensation**

Weir alleged several deficiencies in Plaintiff's performance. First, Plaintiff failed to make an estimated quarterly tax payment in 2008. Plaintiff's responsibilities included ensuring that CompResults timely and properly pay its taxes. Though paying quarterly taxes was a new procedure for the company, Weir felt that this error showed that Plaintiff was not qualified to manage the company's finances.

---

[5] Watkins changed her name to Julie Weir when she and Defendant Weir married in 2009. This Memorandum and Order will refer to Julie Weir as "Watkins" to avoid confusion with Defendant Weir.

[6] Watkins currently serves as the Vice President of Nurse Case Management for CompResults.

Second, Weir's concerns grew in May 2009, when Plaintiff worked with Robinson to revise CompResults' employee handbook, including the job description for her position.  When Weir reviewed the educational requirements and responsibilities articulated for Plaintiff's job description, Weir determined that Plaintiff's education and experience did not qualify her to perform many of functions necessary to successfully manage the financial condition of the company.

Third, Weir received complaints about Plaintiff's hostility from other CompResults employees, including McTeer, Watkins, and administrative employees, Crystal Berry, Sarah Plott, and Rhonda Ramirez.  Early in 2009, McTeer advised Weir that Plaintiff refused to share certain operational information and that she created unnecessary conflict with Watkins and other administrative staff.  McTeer also informed Weir that numerous employees complained about Plaintiff's repeated comments questioning Weir's business judgment and his decision to employ Watkins.  In February 2009, Rhonda Ramirez sent Weir an email resignation, citing Plaintiff's behavior as the reason that she was leaving CompResults.  Weir believed that the email from Ramirez corroborated McTeer's report that employees had complained about Plaintiff's conduct.

Fourth, Defendants allege that CompResults clients also complained about Plaintiff's conduct of questioning Weir's judgment.  In April or May 2009, Weir was approached by Brad Patten ("Patten"), an Executive Director of an important client of CompResults.  Patten informed Weir that Plaintiff had complained to Patten on several occasions about the general changes taking place at CompResults, questioning Weir's judgment in hiring Watkins and McTeer.  Weir became troubled that Plaintiff would discuss internal business affairs with an important client.

Fifth, Defendants allege that Plaintiff exhibited a negative and uncooperative attitude at various leadership classes.   In June 2009, Weir directed that Plaintiff and several other

CompResults employees attend classes at LeaderPoint, an organization that provides executive training.  While the training cost several hundred dollars, Weir hoped that the classes would enhance cooperation among employees, and that Plaintiff would develop a more positive attitude about working with Watkins.  During these classes, Plaintiff became upset with Watkins, who had apparently instructed an employee in Plaintiff's department to train a new hire.  Plaintiff sent an email to Watkins about the training issue, and Weir found the email to be rude, abrasive, and unprofessional.  The President of LeaderPoint, Kirk Hardcastle ("Hardcastle"), told Weir that he had serious concerns about Plaintiff's angry and unprofessional attitude at the training classes.

Finally, as the company continued to grow, Weir became concerned about Plaintiff's compensation expectations.  Plaintiff's compensation began at $12.00 per hour.  By 2008, CompResults paid Plaintiff a base salary of $75,000.00 and a bonus of $100,000.00, making Plaintiff the highest-paid CompResults employee that year.  In 2009, Plaintiff asked Weir to increase her base salary from $75,000.00 to $125,000.00 to reflect that her position in the company was superior to other employees.  Although Weir agreed to raise Plaintiff's base salary to $125,000, he was troubled by Plaintiff's concern that other employees may receive higher compensation.  Weir felt that Plaintiff's performance did not warrant such a large salary due to her failure to make a tax payment and her lack of cooperation with other employees.  Although Weir had numerous concerns regarding Plaintiff's performance, attitude, and expectations, the record reflects that he did not notify Plaintiff of any problems with her performance.

### C.  CompResults's Sexual Harassment Policy

CompResults's Employee Handbook, revised May 2009, states that the company will take all steps reasonably required to prevent, investigate, and promptly correct any harassment or other improper conduct in the workplace.  The Employee Handbook prohibits the following

conduct: unwelcome advances or propositions; sexually oriented, suggestive, obscene, or insulting comments, language, jokes, written or oral references to sexual conduct; comments about an individual's body, sexual activities, experiences or preferences; and displaying or possessing in the workplace sexually suggestive, revealing, or pornographic pictures. The Employee Handbook also prohibits disparaging remarks, epithets, or other offensive and inflammatory conduct based upon an individual's gender.

Under the Employee Handbook, employees are directed to promptly report inappropriate conduct to a supervisor, a member of senior management, or to the Human Resources Department. If an employee believes that a complaint has not received prompt or adequate attention, the Employee Handbook directs the employee to immediately contact a supervisor or the Human Resources Department to inquire into the status of the investigation. In the event that these reporting measures are inadequate or unsuccessful, the Employee Handbook directs employees to meet directly with the company President, Weir.

Finally, the handbook provides that CompResults may initiate a policy of progressive discipline, stating that the company will generally terminate an employee only after a warning by their supervisor and after an opportunity to improve and to meet the requirements of their position. However, the policy provides that it is not intended to alter an employee's status as an at-will employee who may be terminated at any time for unsatisfactory performance.

### D.    Plaintiff's Allegations of Hostile Working Environment

Plaintiff points to several events in her attempt to demonstrate a sexually hostile work environment. Primarily, Plaintiff claims that a hostile work environment resulted from the romantic relationship between Weir and Watkins. Plaintiff told Weir that if he hired Watkins, Plaintiff did not want Weir and Watkins having sexual relations in the office and that she would

not tolerate having to tiptoe around a sexually-active workplace.  However, in January 2009, Plaintiff walked into Weir's office and found Weir and Watkins clothed, but in what she believed to be a romantic position.  At other times, Weir and Watkins would emerge from closed door meetings in his office, straightening out their clothing.

During a seminar in Chicago, Weir and two other gentlemen made jokes about the North American Man/Boy Love Association, an advocacy group for pedophiles.  When a woman emerged from a taxi cab at the same conference, Weir threw his arms around Plaintiff and said, "Pretend like we're together.  I don't want her hitting on me tonight."[7]  In November 2008, Plaintiff attended a similar conference in Las Vegas with Weir, Watkins, and Karen Kono ("Kono"), who worked for a CompResults client.  Weir told Plaintiff that he was sharing a bedroom with Watkins, which made Plaintiff uncomfortable.  During this conference, Weir became inebriated and was touching Kono under the table.  Kono became upset and departed for the bathroom, where she told Plaintiff that she had engaged in an affair with Weir.  Watkins stormed into the bathroom shortly thereafter and told Kono and Plaintiff, "I'm going to kick your ass."[8]  Plaintiff describes this event as the most uncomfortable situation that she had to endure during her employment at CompResults.

During a meeting in January 2009, Weir told Plaintiff about his sexual history, naming some of the women with whom he had engaged in affairs.  Weir told Plaintiff that having sex with women had made them better, lifelong friends.  Plaintiff disagreed, commenting that she had a close friendship with Weir without having had sex.  Weir responded, "Yes, but we could be . . . think how much closer we would be if we had sex."[9]

---

[7] Pl. Dep., Doc. 44, at 49-50.

[8] *Id.* at 151.

After Weir bought CompResults in 2007, he would often display provocative photographs of women on his computer and describe to Plaintiff what he liked about each woman's picture, including his preference for dark hair and large breasts.  Weir also had a habit of "adjusting himself" in front of employees and clients by grabbing his crotch outside of his clothing, which conduct Plaintiff asked him to stop.  On several occasions, Plaintiff became offended when Weir referred to homosexual behavior by using the phrase, "sex in the Viking way."[10]

When the parties discussed Plaintiff's compensation in 2008, Weir demanded that Plaintiff "kick her son to the curb"[11] before he would give her a raise.  Plaintiff responded that Weir should not dictate how she spent her money because he did not similarly tell male employees how to spend their income.  Weir replied, "Are you going to pull a Killinger on me?"  Weir's comment referred to a prior sexual harassment claim asserted against Weir by a former female employee.  Before joining CompResults, Plaintiff worked in a police department for over fifteen years, so she was accustomed to foul language and banter between men.  Because of this experience, Plaintiff was not bothered by Weir's comments or conduct prior to his acquisition of CompResults in August 2007.

### E.  Plaintiff's Allegations of Retaliation

On multiple occasions after January 2009, Plaintiff spoke with CompResults's human resources director, Robinson, about her difficulty working with Watkins.  According to Robinson's sworn affidavit, these discussions generally involved Plaintiff's complaints that she

---

[9] *Id.* at 157-58, 165-66.

[10] *Id.* at 65-67.

[11] *Id.* at 59.

no longer felt appreciated at CompResults because Watkins was beginning to take over her supervisory responsibilities in the company.[12]  Each time Plaintiff discussed her concerns about Watkins, Plaintiff told Robinson not to mention her complaints to Weir.

On May 7, 2009, Plaintiff and Robinson were present at a company meeting when Weir and Watkins had an argument and Weir said, "Fucking women.  Fucking women and their hormones.  Stupid women."[13]  Because Plaintiff was visibly upset by the argument, Robinson followed Plaintiff to her office.  Plaintiff told Robinson that she felt Weir was changing and that Watkins was taking too much power.  Plaintiff also told Robinson that she had accidentally walked in on Weir and Watkins embracing in a romantic position earlier that year.  During this meeting, Plaintiff did not tell Robinson that walking in on Weir and Watkins made her uncomfortable, and Plaintiff did not tell Robinson that she felt she was being sexually harassed by Weir.  Because Plaintiff mentioned walking in on Watkins and Weir in the context of her numerous discussions regarding concerns about Watkins assuming too much power at CompResults, Robinson did not interpret Plaintiff's statement as a complaint of sexual harassment or discrimination.

The parties dispute whether Plaintiff asked Robinson to confront Weir about this conduct.  Plaintiff testified that during their conversation on May 7, 2009, she told Robinson, "I need you to go talk to Jim [Weir].  We need to fix this."  In fact, Plaintiff testified, "I begged [Robinson] to go talk to Jim [Weir]."[14]   However, Robinson alleges that after inquiring multiple times, Plaintiff repeatedly told him not to disclose her concerns to Weir.[15]  After Plaintiff spoke with

---

[12] Aff. of Kevin Robinson, Doc. 45-4, at 2.

[13] Pl. Dep., Doc. 44, at 181-83.

[14] *Id.* at 192.

[15] Aff. of Kevin Robinson, Doc. 45-4, at 3.

Robinson on May 7, 2009, she attempted to speak with Weir directly.  However, Plaintiff was unable to communicate her complaints because Weir said, "I don't want to hear it, I'm not talking about it."[16]  Accordingly, Plaintiff felt that she was left with no choice but to rely upon Robinson to address her concerns.  While Plaintiff alleges that she had spoken with Weir many times about inappropriate things that were said or done in the office, she does not specify the content or the time of these alleged discussions.

Several weeks later, in June 2009, Plaintiff asked if Robinson had spoken to Weir about the concerns she expressed on May 7, 2009.  At that time, Robinson decided to inform Weir of Plaintiff's unhappiness at work.  Robinson only told Weir that he had a power struggle on his hands between Plaintiff and Watkins, to which Weir responded, "I know."[17]  Robinson did not tell Weir that Plaintiff reported walking in on Weir and Watkins or that she was upset about Weir's statements about women on May 7, 2009.  Further, because Robinson did interpret the concerns that Plaintiff communicated as allegations of sexual harassment, he did not inform Weir or anyone else that Plaintiff made any complaint of sexual harassment or discrimination. However, Plaintiff alleges that in June 2009, Robinson told her, "You don't have a harassment complaint until you've been retaliated against"[18] and, "[u]ntil Jim [Weir] fires you, you don't have a harassment complaint."[19]

Plaintiff was terminated by letter dated August 14, 2009, which advised that CompResults was eliminating Plaintiff's position of Vice President of Operations.  Plaintiff believes that she was terminated because she complained about the relationship between Weir

---

[16] Pl. Dep., Doc. 44, at 192.

[17] Aff. of Kevin Robinson, Doc. 45-4, at 4.

[18] Pl. Dep., Doc. 44, at 201.

[19] *Id.*

and Watkins, and because she didn't succumb to Weir's attempt to have power over her.  Though Plaintiff's former position was eliminated, many of her responsibilities have been assumed by Mike Callahan ("Callahan"), who has served as CompResults' Vice President of Finance since August 2009.  Callahan earned a graduate degree in business and has significant work experience but was compensated at less than one-half of Plaintiff's former compensation.

On December 28, 2009, Plaintiff filed her charges of discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission ("KHRC").  On May 2, 2011, the KHRC issued its Case Summary Report, finding probable cause for claims concerning retaliation and sexual harassment related to a hostile work environment.  On August 17, 2011, the KHRC terminated its proceeding and advised Plaintiff to seek her right to sue letter from the EEOC.

### F.  Plaintiff's Expert Witness Designation

On February 8, 2012, Plaintiff made her initial disclosures under Rule 26(a)(2), which indicated that she intended to retain an unidentified expert witness to offer testimony supporting plaintiff's claims for front pay and back pay.  On February 16, 2012, the Court entered its Scheduling Order (Doc. 10), which required that Plaintiff disclose expert witnesses by March 30, 2012.  However, Plaintiff failed to formally disclose an expert witness until January 22, 2013, when Plaintiff identified economist Barbara Leonard Voight, C.P.A.  Plaintiff argues that Defendants are not prejudiced by this delay because her proposed expert's opinion regarding front pay and back pay is substantially the same a detailed calculation of damages that Plaintiff articulated to Defendants in a settlement proposal dated February 21, 2012.  Discovery in this case closed on May 7, 2012.  While the original trial date was rescheduled for April 1, 2013, the Court has not modified any other case deadlines.

## II.        Standards

### A.        Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[20]   "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[21]   "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[22]   In determining whether a claim is facially plausible, the court must draw on its judicial experience and common sense.[23]   All well-pleaded facts in the complaint are assumed to be true and are viewed in the light most favorable to the plaintiff.[24]   Allegations that merely state legal conclusions, however, need not be accepted as true.[25]

### B.   Summary Judgment

The Court is familiar with the standards governing the consideration of summary judgment.   Summary judgment is appropriate "if the pleadings, depositions, answers to

---

[20] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[21] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[22] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

[23] *Iqbal*, 556 U.S. at 678.

[24] *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

[25] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[26]  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[27]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[28]  In considering a motion for summary judgment, the Court must examine the evidence in a light most favorable to the nonmoving party.[29]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[30]  The moving party need not disprove the nonmoving party's claim, but must only establish that the factual allegations have no legal significance.[31]  If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial.[32]  In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations.[33]  Finally, the Court notes that summary judgment

---

[26] Fed. R. Civ. P. 56(c).

[27] *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[28] *Id.*

[29] *Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[30] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[31] *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

[32] *Celotex*, 477 U.S. at 323.

[33] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[34]

### III.    Analysis

**A.  Defendant Weir's Motion to Dismiss**

In Count III of her Complaint, Plaintiff asserts a claim against Defendant Weir in his individual capacity for violation of the Kansas Act Against Discrimination ("KAAD").[35]  That Act provides that "[i]t shall be an unlawful employment practice . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or attempt to do so."[36]  Weir argues that Count III must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because individual-capacity suits are inappropriate under the KAAD as a matter of law.  Alternatively, Weir contends that dismissal is proper because Plaintiff failed to exhaust her administrative remedies by omitting any allegation regarding violation of the KAAD in her proceedings before the Equal Employment Opportunity Commission ("EEOC").

Courts in this district have consistently held that claims arising under the KAAD may not be brought against an employer or supervisor in his individual capacity.[37]  Count III of Plaintiff's Complaint refers to the singular "Defendant, Weir," and alleges that he "personally" engaged in activity forbidden by the KAAD.[38]  The Court finds that Defendant Weir is not subject to

---

[34] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[35] K.S.A. § 44-1001, et seq.

[36] K.S.A. § 44-1009(a)(7).

[37] *Davidson v. MAC Equip., Inc.*, 878 F. Supp. 186, 187-88 (D. Kan. 1995); *McCue v. State of Kan., Dept. of Human Res.*, 938 F. Supp. 718, 726 (D. Kan. 1996); *Johnson v. Van Tuyl*, 1994 WL 373884, *1 (D. Kan. June 9, 1994).

[38] Complaint, Doc. 1, at 10.

personal liability under the KAAD.  Accordingly, the Court grants Weir's motion to dismiss Count III of Plaintiff's Complaint as it relates to Weir.  Accordingly, the Court need not reach the parties' arguments regarding whether Plaintiff preserved that claim by exhausting her administrative remedies.

### B.  Defendants' Motion to Strike Plaintiff's Expert Designation

Defendants ask the Court to strike Plaintiff's expert designation as untimely.  Federal Rule of Civil Procedure 37(c)(1) governs sanctions for insufficient or improper disclosure. Before imposing sanctions pursuant to that Rule, the Court must first find a failure to disclose information required under Federal Rule of Civil Procedure 26 and must conclude whether the insufficient disclosure was harmless.[39]

The Court finds that Plaintiff's expert disclosures were insufficient and untimely. Federal Rule of Civil Procedure 26 provides that "a party must disclose to the other parties the *identity* of any witness it may use at trial to present evidence at trial . . . ."[40]  Further, the Court's Scheduling Order required that Plaintiff identify and designate any expert witnesses on or before March 30, 2012.  The Court finds that, while Plaintiff's initial disclosures contemplated the potential that she may engage an expert in the future, Plaintiff did not affirmatively identify or designate an expert witness until January 22, 2013, long after the disclosure deadline set forth in the Court's Scheduling Order.  The Court also finds that Plaintiff's failure was not harmless. Although Plaintiff's settlement proposals may have included estimates of front pay and back pay that are similar to those calculated by Plaintiff's proposed expert, the lack of disclosure precluded Defendants from obtaining discovery regarding the witness's credibility, credentials,

---

[39] *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 679-80 (D. Kan. 1995).

[40] Fed. R. Civ. P. 26(a)(2)(A) (emphasis added).

or the content and scope of testimony that the expert would offer at trial.  Because Plaintiff disclosed her proposed expert witness nearly ten months after the close of discovery, and only two months before trial, the Court finds that Defendants would be prejudiced by the untimely disclosure.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[41]  Because Plaintiff failed to timely disclose her expert witness pursuant to Rule 26(a) and the Court's Scheduling Order, and because such failure is not harmless, the Court concludes that Plaintiff may not use Barbara Leonard Voight, CPA, to supply evidence or expert testimony. Accordingly, Defendant's motion to strike Plaintiff's expert witness must be granted.

### C.  Defendants' Motion for Summary Judgment

#### 1.  Sexual Harassment and Hostile Working Environment

##### a.  Timely Exhaustion of Administrative Remedies

Count I of Plaintiff's complaint states a claim for sexual harassment giving rise to a hostile work environment.  Defendants first argue that summary judgment is proper because Plaintiff failed to file an EEOC charge within 180 days of the alleged harassment.  The Court disagrees.  Indeed, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite under Title VII in the Tenth Circuit."[42]  To exhaust administrative remedies, a plaintiff generally must present his claim to the Equal Employment Opportunity Commission ("EEOC") or the

---

[41] Fed. R. Civ. P. 37(c)(1).

[42] *Fulcher v. City of Wichita*, 2009 WL 6832587, *2 (D. Kan. Sept. 11, 2009) (citing *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005)).

authorized state agency, the Kansas Human Rights Commission ("KHRC"), and receive a right-to-sue letter based on that charge.[43]

42 U.S.C. § 2000e-5(e)(1) states that a charge must be filed "within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ."[44]  However, that statute also provides that "with respect to which the person aggrieved has initially instituted proceedings with a State or local agency . . .  such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . ."[45]  Therefore, "[i]n a deferral state such as Kansas, a Title VII claimant must file his discrimination charge within 300 days of the alleged unlawful act."[46]

Here, Plaintiff filed her administrative charges with the EEOC and the KHRC on December 28, 2009.  Accordingly, the alleged misconduct must have occurred on or after March 3, 2009, 300 days prior to Plaintiff's administrative charges.  Plaintiff alleges numerous discrete events that occurred within that time, including Weir's statements about women on May 7, 2009, Plaintiff's complaints to Robinson and attempted complaint to Weir on that same day, and Plaintiff's termination on August 14, 2009.

Unlike traditional claims of sexual harassment, hostile work environment claims "do not consist primarily of discrete acts, but often involve a series of incidents that span a period longer than 300 days.[47]  "The continuing violations doctrine is available for hostile work environment

---

[43] *Id.* (citing *Zhu v. Fed. Hous. Fin. Bd.*, 389 F. Supp. 2d 1253, 1276 (D. Kan. 2005)).

[44] 42 U.S.C. § 2000e-5(e)(1).

[45] *Id.*

[46] *Fulcher*, 2009 WL 6832587 at *2.

[47] *Id.*

claims."[48]   Under that doctrine, "as long as 'an act' contributing to a hostile work environment took place no more than 300 days before the plaintiff filed an EEOC charge, a court may consider the complete history of acts comprising the hostile work environment."[49]   For the continuing violations doctrine to apply, "there must be a relationship between acts alleged after the beginning of the filing period and the acts alleged before the filing period."[50]

Because Plaintiff's administrative charges expressly allege a hostile work environment arising from recurring events, the Court finds that the continuing violations doctrine applies to Plaintiff's claim.  Plaintiff's complaints to Robinson on May 7, 2009, fell within the 300-day period.  These complaints not only addressed her concern that Watkins was taking too much power; they also contemplated the incident when Plaintiff walked in on Weir and Watkins in an intimate position.  The Court also notes that Plaintiff's May 7, 2009, conversation with Robinson occurred because Plaintiff was visibly upset after Weir made profane statements about women.  Because these allegations concern Plaintiff's allegations of recurring events creating an uncomfortable sexual and demeaning workplace, the Court finds that a sufficient relationship exists between the acts alleged both before and after the administrative filing period.  Accordingly, the Court will consider the complete history of alleged acts in deciding Plaintiff's hostile work environment claim.

### b.    Plaintiff's Hostile Work Environment Claim

To establish a sexually hostile work environment claim, a plaintiff must demonstrate that "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."[51]   For the purposes of summary judgment, Defendants do not dispute that Plaintiff is a member of a protected group or that Plaintiff encountered sexual or gender-based statements and conduct.  Instead, Defendants argue that Plaintiff's allegations fall short of establishing sufficiently severe and pervasive conduct to support her sexually hostile work environment claim.

The Tenth Circuit has established that the severe and pervasive nature of alleged sexual harassment must be established under both objective and subjective standards.[52]   To establish the subjective aspect of a hostile work environment, the victim must merely show that she subjectively perceived the environment to be abusive.[53]   Defendant argues that because Plaintiff had worked in a police department for fifteen years prior to her employment with CompResults, she was accustomed to foul language and was not offended by Weir's conduct.   The Court disagrees.   Plaintiff repeatedly alleges that she was very offended by Weir's statements and conduct.   For example, several statements of uncontroverted fact reflect that, "[Plaintiff] was stunned, embarrassed and appalled by the behavior of Weir and Watkins,"[54] to the point that she was visibly shaking.   The Court finds that Plaintiff has successfully established the subjective portion of her hostile work environment claim.

The objective component of a hostile work environment claim requires a plaintiff to present evidence that a "reasonable person" would find the same harassment so severe and pervasive that the workplace is objectively hostile or abusive.  Under this standard, Plaintiff must

---

[51] *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (quotation and citations omitted).

[52] *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1023 (10th Cir. 2001).

[53] *Id.*

[54] Pl. Memorandum in Opp. To Defs.' Mot. for Summary Judgment, Doc. 43, at 48.

establish behavior "so objectively offensive as to alter the conditions of the victim's employment."[55] The United States Supreme Court has provided several non-exclusive factors that district courts should consider to determine if alleged sexual harassment is severe and pervasive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[56]  Finally, the Tenth Circuit has noted that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."[57]

The evidence before the Court shows that between Weir's acquisition of CompResults in August 2007 and Plaintiff's termination in August 2009, Plaintiff encountered regular sexual and gender-based comments and conduct.  It is uncontroverted that Weir told Plaintiff that they might have a closer friendship if they had engaged in a sexual relationship.  Weir had physical romantic interactions in the office with Watkins, a CompResults employee, and touched other women under the table at business conferences.  Weir displayed provocative photographs of women on his computer and told Gordon that he preferred the photos of women with dark hair and large breasts.  Weir repeatedly grabbed his crotch in front of employees and clients even after Plaintiff told him to stop.  On several occasions, Weir made jokes about employees or clients belonging to an advocacy group for pedophiles.  Finally, a business meeting erupted when Weir made profane statements about women's hormones.  The Court finds that a rational jury could conclude that these facts describe a hostile work environment that is objectively severe and pervasive.  Because objective severity and pervasiveness constitute quintessential issues of fact,

---

[55] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotations omitted).

[56] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

[57] *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999) (internal quotations omitted).

the Court denies Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

### 2.      Retaliation

Count II of Plaintiff's Complaint alleges that she suffered unlawful retaliation.  The relevant portion of Title VII concerning retaliation claims provides, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice."[58]  The Court reviews retaliation claims under the familiar *McDonnell Douglas* burden-shifting framework.[59]  "To establish a prima facie claim for retaliation, a plaintiff must establish that "(1) she was engaged in opposition to Title VII discrimination; (2) she was subjected to adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action."[60]  If a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.[61]  If the defendant carries that burden, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action."[62]  Here, Defendants concede that Plaintiff suffered an adverse employment action when she was terminated on August 14, 2009, but Defendants dispute that Plaintiff engaged in protected activity or that a causal connection exists between protected activity and any adverse employment action.

---

[58] 42 U.S.C. § 2000e-3(a).

[59] *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004).

[60] *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262–63 (10th Cir. 1998).

[61] *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 752 (10th Cir. 1999).

[62] *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1265 (10th Cir. 2009).

To establish a causal connection necessary for a prima facie case of retaliation, the plaintiff "must show that the individual who took adverse action against [her] knew of the employee's protected activity."[63]  When the alleged adverse employment action is termination, the plaintiff must show that the decision-maker responsible for her termination knew about a protected action.[64]  Here, Plaintiff alleges that she engaged in protected activity when she issued complaints to Robinson on May 7, 2009, and several weeks later, in June 2009.  It is undisputed that Weir was the sole decision-maker with regard to Plaintiff's termination.  Accordingly, Plaintiff must demonstrate that Weir knew of Plaintiff's complaint to Robinson concerning his romantic relationship with Watkins at the time Weir made the termination decision.

In a sworn affidavit,[65] Robinson indicates that he only informed Weir that Plaintiff and Watkins were struggling for power and responsibility in the company.  Robinson did not inform Weir or anyone else that Plaintiff reported walking in on Weir and Watkins, and Robinson did not inform Weir that Plaintiff made any complaint of sexual harassment or discrimination.  Weir also submitted a sworn affidavit that describes his conversation with Robinson:

> At some point in either June or early July 2009, Kevin Robinson came to me and said he had talked to [Plaintiff] and it was his opinion that he thought I had a "power struggle" going on.   It was obvious to me that he was talking about [Plaintiff's] resistance to Julie Watkins and Mike McTeer.  I looked at Kevin Robinson and told him, "I know."  The conversation ended at that point.  Kevin Robinson did not say anything else to me about [Plaintiff] during this conversation.  After this conversation, I cannot recall talking to Kevin Robinson about [Plaintiff] up through the time her employment was terminated on August 14, 2009.[66]

---

[63] *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).

[64] *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000).

[65] Aff. of Kevin Robinson, Doc. 45-4, at 4.

[66] Aff. of James Weir, Doc. 36, at 12-13.

Weir's affidavit indicates that he had no knowledge of Plaintiff's complaints until after her termination: "The first time I heard about [Plaintiff] making a complaint or allegations of sexual harassment or gender discrimination was several weeks after her employment ended through a letter from her attorney."[67]   Plaintiff has not provided any evidence to controvert the sworn affidavits of Weir and Robinson.   Because the evidence before the Court indicates that Weir had no knowledge of Plaintiff's alleged protected activity when he terminated Plaintiff, the Court finds that Plaintiff cannot demonstrate the causal nexus required to establish a prima facie case of retaliation.   Therefore, summary judgment is appropriate on Plaintiff's retaliation claim, and the Court need not reach the parties' arguments regarding whether Plaintiff's complaints to Robinson properly constitute protected activity or whether Defendants' proffered reasons for terminating Plaintiff were pretextual.

**IT IS ACCORDINGLY ORDERED** that Defendant Weir's Motion to Dismiss (Doc. 15) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiff's Expert Designation (Doc. 49) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 33) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 22nd day of February, 2013.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[67] *Id.* at 16.